SUSAN M. CHEHARDY, Judge.
| j>This appeal arises in a partition suit between a widow and her adult stepchildren, consolidated with a suit against the widow by one of the stepchildren. That stepchild appeals a judgment that dismissed the claim against the widow for failure to act as a prudent administrator of her usufruct of the family home. We affirm.
FACTS
Victoria Pendergast was married to Harold A. Pendergast, Sr. and they resided at 2457 Roosevelt Boulevard in the Westgate subdivision in Kenner, a home they had purchased in 1973. Harold Pendergast, Sr. died testate in 1994. As surviving spouse in community, Victoria Pendergast was owner of a one-half undivided interest in the family home. In his will Harold Pendergast, Sr. bequeathed his one-half undivided interest to his children from his first marriage, Harold Pendergast, Jr. and Margaret Pendergast Adolph, and granted Victoria Pendergast a testamentary usu-fruct over their portion. The parties were placed in possession by judgment of possession in June 1994.
Ms. Pendergast continued to reside in the home for a decade after her husband’s death. In May 2004, due to advanced age and infirmity, she went to live |swith her son from a former marriage, Joseph R. Berthelot, III. Mr. Berthelot informed Mr. Pendergast Jr. and Ms. Adolph that his mother wished to sell the property. In June 2004 the three met at the house to sign a listing agreement, but due to disagreement the meeting was aborted.
In December 2004 Mr. Berthelot, acting on behalf of his mother by power of attorney, filed suit against Harold Pendergast, Jr. and Margaret Adolph to force partition of the property. (Berthelot v. Pendergast, No. 08-CA-116 on the docket of this Court; No. 614-428 on the docket of the 24th Judicial District Court.)
In May 2005 Margaret Adolph filed a separate suit against Victoria Pendergast, alleging Ms. Pendergast failed to act as a *800 prudent administrator of the property by negligently allowing a leaking sewer line to progress into a serious foundation problem. (Adolph v. Pendergast, No. 08-CA-117 on the docket of this Court; No. 620-974 on the docket of the 24th Judicial District Court.) The suits were consolidated.
Despite attempts to confect a private sale, the property ultimately was sold at public auction for $54,000.00. The net proceeds of the sale, $50,595.56, were placed into the registry of the court.
By the time of trial, the issues in Berthelot v. Pendergast had been mostly resolved by the sale of the property, but the issues in Adolph v. Pendergast remained to be decided. It was undisputed that the parties each are entitled to their respective shares of the proceeds according to their ownership interests in the property. The issues were whether Ms. Pendergast, as usufructuary, was entitled to payment of her attorney’s fees for the partition suit, and whether Ms. Pendergast was liable to Ms. Adolph for the serious structural damage to the property caused by its sinking foundation.
[4At trial on the merits, the testimony established that by the time the partition suit was filed in December 2004, the house had developed severe foundation problems. The slab was sinking so much in its center that it’ was almost bowl-shaped. This resulted in fracture of the slab, misalignment of doors, cracks in the walls, and large gaps at the bases of the walls.
Mr. Berthelot testified that after his stepfather’s death, he made arrangements for repairs while his mother remained in the house. Among repairs done over a span of years were a new roof, a new air conditioning system, and replacement of the sewer line in 2003. Mr. Berthelot denied Ms. Adolph’s allegation that the sewer line had been leaking for two years before it was repaired. He said as soon as he was told about the problem, which manifested in problems flushing the toilets, he contacted a plumber. The sewer line was repaired within two to three weeks.
Mr. Berthelot testified that in 1980, his mother and his stepfather had the home’s foundation shored. A receipt entered in evidence that showed the house had been shored by the placement of pilings under the perimeter of the slab.
Mr. Berthelot also filed in evidence a summary of the water bills for the house from 2000 to 2006 that showed no significant differences in the amounts of monthly water usage.
While the litigation was pending, the parties attempted to negotiate a private sale of the property. They received two offers to purchase the home. The first, in February 2005, was for $75,000; it lapsed due to the parties’ disputes over payment of certain items. Mr. Berthelot wanted Ms. Adolph to pay his attorney’s fees for the filing of the partition suit. Ms. Adolph refused to do so, unless Mr. Berthelot was willing to waive his mother’s rights as usufructuary.
| ..¡Subsequently, they entered into a consent judgment, under which Ms. Adolph agreed to accept “the highest written offer to purchase the property at a private sale, or produce a higher written offer to purchase the property at private sale, on or before Friday, June 3, 2005.” The agreement provided that any proceeds of the sale would be placed in the registry of the court.
The second offer, in June 2005, was for $60,000. Despite the consent judgment, that offer also fell through while the parties continued to bicker.
Mr. Berthelot had the house appraised in July 2005; the appraiser valued it at $81,000. In January 2006, the house was *801 sold at public auction to Ms. Adolph’s son for $54,000. As noted above, the net proceeds of the sale were deposited into the court registry.
Mr. Berthelot admitted that when he last saw the house, before it was sold at public auction in January 2006, there were cracks in the walls, the slab was caving in, the doors were hanging crooked, and walls were separating from the slab. He said the house had been in that condition for years, but it had gotten worse in the last couple of years.
Frank Fromherz, an expert in structural engineering, testified he was hired by Mr. Berthelot to inspect the house. He discovered the slab had a severe bowl-shaped deflection. There was a crack that could be felt under the carpet. Some of the walls were hanging from the ceiling, with space between the bottom of the walls and the slab.
Mr. Fromherz believed the cause was areal subsidence, a problem that has been observed in the New Orleans metropolitan area for the past 50 years. “Areal subsidence” is a term for the condition that results when the water table lowers and the lack of moisture causes soft surface soils to consolidate. Mr. Fromherz said that consolidation of soils was the cause of the settlement.
| ^According to him, an open sewer line could accelerate the problem by washing away materials that could support the slab into the open pipe. If the sewer line was broken for an extended period, it could accelerate whatever settlement was occurring. He said it could not have caused a problem in only two or three weeks.
In addition, Mr. Fromherz said, there is a problem with the way the house is constructed. It should have had grade beams in the slab to support it, but the shape of the deflection makes it appear there is no grade beam under the slab.
Mr. Fromherz said the house was built 40 to. 50 years ago, and this kind of subsidence takes 20 to 30 years. He said the shoring of the house 26 years ago explains why the middle is sinking and the edges are stable; the shoring was done on the perimeter, but the lack of grade beams across the center allowed the slab to continue to drop. The house has all its plumbing along the back wall, but the point of greatest settlement is at the middle of the slab, not toward the back. That is why he believed the sewer leak did not cause it.
Ms. Adolph testified her cousin, Norman Pendergast, handled her father’s succession. When he met with them all to explain what had to be awarded, her stepmother was told she had to return the house in the same condition in which she had received it because she had the usu-fruct.
Ms. Adolph testified she had stayed in the home for the week before her father died. She did not see anything wrong with the house then. There definitely was no separation of the walls. After her father’s death she visited her stepmother “fairly often,” but eventually stopped going because she felt uncomfortable. She admitted that when she visited the house after her father died, she stayed in the front room and her visits were brief, so she was unable to say whether there was damage in the rest of the house.
|7When she went to the house for the meeting about selling it in 2004, it had been several years since she had been there. That was when she first noticed the damage to the house. She said it was “unbelievable” because when she was there before, there was no damage. She recalled-a conversation with her brother, Harold, in which he told her “the base *802 boards are coming up off the floor.” That may have been a few months before the June 2004 meeting.
When Mr. Berthelot called to tell her he was moving his mother in with him, he told her there were some problems with the house. He said the house needed repairs and he didn’t want to fool with it.
Ms. Adolph testified she didn’t want to sign the paper to sell the house because she wanted Mr. Berthelot to waive the usufruct. She was willing to accept the $75,000 offer, but they could not come to an agreement. He indicated he was going to waive the usufruct, but only in return for her payment of his attorney’s fees in the partition action. She did not feel she should have to do that. ■ The same thing happened with the offer for $60,000.
Ms. Adolph testified that Allstate paid $3,279.15 on the claim for damage from Hurricane Katrina, but the money was not used to repair the hurricane damage.
She admitted she had no evidence to substantiate her allegation that the sewer problem began in 2001. She said she drew the conclusion because “the house went down so quick.”
George Aldrete, an expert in shoring, testified as Ms. Adolph’s expert witness. In June 2005, at the invitation of Ms. Adolph’s son, Melvin Adolph, he wrote a proposal for shoring the house. The total cost of his proposal was $15,400.
Mr. Aldrete testified that sinkage is going on around Louisiana, particularly in Kenner and Metairie. The house has a floating slab, which is an earth-supported | Sslab with no pilings. It has a center grade beam in the hall area. In his opinion, if the house had been shored 10 years before, the interior would not have been as damaged as it was by the time of the sale.
Mr. Aldrete did not attribute the damage in this case to subsidence. He said that to create this amount of damage there had to be kind of scouring under the slab; that is, water or something washing out the existing dirt and clay that supports the slab.
He said his company has leveled over 50% of the houses in the Westgate subdivision, but he had never seen damage this severe. According to him, in a case of subsidence the house will settle more or less uniformly. Here, however, the slab has actually become concave. He said the only way to explain it is that the material underneath was washed out. If it was a broken pipe around the outside wall, he said, it would show on the outer perimeter.
He said he is very familiar with the homes in the Westgate subdivision, because he lives in Westgate, and over 30 years he has done a hundred or so houses, so he knows where the grade beams are. He said you cannot see a grade beam unless you dig under the slab.
Upon being informed that the house was shored in 1980, with beams around the perimeter of the slab but not in the center, he still did not agree that would cause the slab to sink in a concave manner. He said the sinkage went almost all the way to the edge where the chain walls are, but the walls on the perimeter are not separated from the slab.
He agreed that a broken sewer line that was repaired within two to three weeks would probably not cause this extent of damage; it would take some time.
The district court rendered judgment denying attorney’s fees to Ms. Pendergast in the partition action and denying Ms. Adolph’s claim for damages in |9the prudent administrator case. In written reasons included within the judgment, the trial court found as follows.
*803 With respect to the prudent administrator claims, the court found the testimony of Mr. Fromherz more convincing. The court concluded that the home’s foundation problem resulted from areal subsidence, rather than from water or sewerage leaking from broken pipes. The court found the subsidence was not the result of Ms. Pendergast’s neglect, and she did not fail to act as a prudent administrator.
As to whether the foundation repair was “ordinary maintenance” for which Ms. Pendergast as usufructuary was responsible, the court concluded the repair of the property’s structural damage constitutes an extraordinary repair and, thus, was the responsibility of the naked owners rather than the usufructuary. The court also found that Ms. Pendergast is entitled to usufruct over the property’s sale proceeds.
Finally, on the issue of whether Ms. Pendergast is entitled to attorney’s fees from Ms. Adolph, the court ruled that the usufruct is testamentary and therefore a conventional usufruct. As such, La.C.C. art. 596 applies, which mandates that expenses of litigation between the usufructu-ary and the naked owner be borne by the person who incurred them.
Ms. Adolph filed a motion for new trial, citing newly-discovered evidence regarding existence of a center grade beam in the house’s foundation. The trial court denied the motion for new trial because, first, Ms. Adolph failed to show she could not have obtained the new evidence prior to the trial and, second, even if the new evidence were considered, it did not change the court’s opinion as to the cause of the damage to the house:
Furthermore, even assuming the existence of the center grade beam, we are still unconvinced that Victoria Pender-gast acted as an imprudent administrator or that Imthe home’s foundation problems were the result of her neglect. Mr. Fromherz’s erroneous opinion regarding the grade beam was not the only basis for his conclusion, and was not the portion of his testimony upon which the Court relied.
In the Court’s opinion, the much more significant portion of Fromherz’s testimony had to do with areal subsidence. Fromherz testified that the root cause of the home’s foundation damage was “areal subsidence” caused by the lowering of the water table and soil consolidation. His report stated, “There is no maintenance activity that could have been performed by any of the owners that would have prevented the deflection of the floor slab due to areal subsidence. In fact, it is highly likely that the settlement of the floor slab was the cause of the sewer problems — not the other way around.” ... Even Ms. Adolph’s shoring expert, George Aldrete, indicated that there was a significant subsidence problem in the area. He states, “I have shored over 50% of the houses in the Westgate Subdivision and found that all these houses have a center grade beam.”
APPEAL
Ms. Adolph has appealed. On appeal she asserts the trial court erred in the following respects:
1. The trial court erred in holding that plaintiff, Ms. Adolph, failed to meet her burden of proving that Victoria Pendergast breached her duty to be a prudent administrator by not addressing or timely notifying the naked owners of the severity of the foundation problem;
2. The trial court erred in failing to rule on the issue of whether the post-Katrina insurance proceeds should have been used to either repair the damage to the dwelling *804 caused by Katrina or credit the usu-fruct.
| ^Liability as Prudent Administrator
Ms. Adolph argues that Ms. Pendergast failed to act as a prudent administrator because the house’s foundation was severely damaged by major subsidence of the soil beneath the house. Ms. Adolph contends the subsidence was due to Ms. Pender-gast’s failure to repair broken plumbing beneath the slab. Alternatively, given the trial court’s determination that the subsidence was areal subsidence and was not caused by broken plumbing, Ms. Adolph argues that Ms. Pendergast nonetheless had a duty to notify the naked owners of the foundation damage before the damage became severe.
The usufructuary is bound to use non-consumable things as a prudent administrator and to deliver them to the naked owner at the termination of the usufruct. La.C.C. art. 539.
“The usufructuary is answerable for losses resulting from his fraud, default, or neglect.” La.C.C. art. 576.
The usufructuary is responsible for ordinary maintenance and repairs for keeping the property subject to the usu-fruct in good order, whether the need for these repairs arises from accident, from the normal use of the things, or from his fault or neglect.
The naked owner is responsible for extraordinary repairs, unless they have become necessary as a result of the usu-fructuary’s fault or neglect in which case the usufructuary is bound to make them at his cost.
La.C.C. art. 577.
“Extraordinary repairs are those for the reconstruction of the whole or of a substantial part of the property subject to the usufruct. All others are ordinary repairs.” La.C.C. art. 578.
“The usufructuary may not compel the naked owner to make the extraordinary repairs for which the owner is responsible. If the naked owner |12refuses to make them, the usufructuary may do so, and he shall be reimbursed without interest by the naked owner at the end of the usu-fruct.” La.C.C. art. 579.
The usufructuary may release himself from the obligation to make repairs by abandoning the usufruct.... La.C.C. art. 582.
Considering these principles of law, we find no error in the trial court’s ruling that the repairs were extraordinary repairs and thus were the responsibility of the naked owners. Similarly, we find no merit to Ms. Adolph’s argument that Ms. Pendergast violated her duties as usufruc-tuary by failing to make the repairs herself and then seeking reimbursement from the naked owners. Nor do we find merit to the contention that by failing to make the foundation repairs, then moving out of the house, Ms. Pendergast “abandoned” her usufruct.
We find no error in the trial court’s determination, based on Mr. Fromherz’s testimony, that there was “no maintenance activity which would have prevented the deflection of the slab.” We interpret “maintenance activity” as meaning the “ordinary maintenance” that would be the responsibility of the usufructuary.
Similarly, we find no merit to the assertion that Ms. Pendergast violated her duty by failing to notify Ms. Adolph and Mr. Pendergast of the damage to the house. The testimony of both Mr. Pender-gast and Ms. Adolph indicates that, in fact, they were aware of the problems some time before the 2004 meeting between the parties about selling the house. Further, as Mr. Fromherz testified, this type of damage occurs over a long period, from 20 *805 to 30 years. Ms. Adolph did not carry her burden of proving that Ms. Pendergast failed to be a prudent administrator.
Insurance Proceeds
Ms. Adolph’s pleadings did not raise any issues as to use or misuse of insurance proceeds. At trial there was testimony that Hurricane Katrina caused some damage to the property: there were fallen trees, and damage to the fence and [lsthe rain gutter along the front of house. Ms. Pendergast received $3,328.61 from the homeowner’s insurance on the house for the damage. Mr. Berthelot testified some of the money was used for tree removal, but the other repairs were not made because by that time the house was to be sold at public auction.
On appeal Ms. Adolph asserts the trial court erred in failing to address the insurance proceeds. As the court noted at the end of the trial, however, Ms. Adolph had made no specific claim regarding insurance proceeds.
Ms. Adolph argues the issue should be considered as evidence of Ms. Pender-gast’s failure to act as a prudent administrator by failing to repair the hurricane damage for which the proceeds were paid.
We find no error in the trial court’s failure to address this issue. “When proceeds of insurance due on account of loss, extinction or destruction of the property subject to usufruct, the usufruct attaches to the proceeds.” La.C.C. art. 617. As such, Ms. Pendergast was entitled to use the insurance proceeds.
For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the appellant, Margaret Adolph.
AFFIRMED.